The undersigned have reviewed the award based upon the record of the proceedings before the deputy commissioner.
The appealing party has shown good grounds to reconsider the evidence. However, upon much detailed reconsideration of the evidence as a whole, the undersigned reach the same facts and conclusions as those reached by the deputy commissioner, with some minor technical modifications. The Full Commission, in their discretion, have determined that there are no good grounds in this case to receive further evidence or to rehear the parties or their representatives, as sufficient convincing evidence exists in the record to support their findings of fact, conclusions of law, and ultimate Award.
Accordingly, the Full Commission find as fact and conclude as matters of law, which were entered into by the parties at the initial hearing as
 STIPULATIONS
1. It is stipulated that all parties are properly before the Commission, and that the Commission has jurisdiction over the parties and over the subject matter.
2. All parties hereto are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. The defendant was self-insured and provided workers' compensation coverage for plaintiff at the time of the incident which is the subject of this action.
4. At the time of the subject incident, plaintiff-employee was employed by defendant-employer.
5. The parties agree that the Industrial Commission will determine the plaintiff-employee's average weekly wage and compensation rate based upon the evidence presented in the event that plaintiff-employee prevails.
6. Plaintiff-employee has had on-going medical treatment for her medical condition.
In addition, the parties stipulated into evidence the following:
1. Medical records of Dr. William Folds.
2. Medical records of Dr. Neil Simstein.
3. Medical records of Dr. Scott Baker and Dr. Amanda Pennington, BGSM/NCBH.
4. Medical records of Forsyth Memorial Hospital.
5. Medical records of Dr. James E. Peacock, WFU Physicians, BGSM.
6. Medical records of Dr. Joseph J. Eron.
7. Medical records of UNC Memorial.
8. Medical records of The Breast Clinic.
9. Medical records of National Health Laboratories.
10. Medical records of Smith Klein Beecham Labs.
11. Medical records of Specialty Labs, Inc.
12. Medical records of occupational Health Services (CMI).
The parties have stipulated that the following photostatic copies of the medical records of patient X (now deceased) [pursuant and subject to a protective order of Commissioner Dianne Sellers] from whom plaintiff alleges she contracted her disease, are true and accurate copies of the originals; and any of said medical records may be admitted into evidence at hearing (and at any depositions) of this action:
1. Medical records of Forsyth Memorial Hospital; and
2. Medical records of Associates Regional and University Pathologists, Inc., (FMH).
It is further stipulated and agreed by the parties that the patient's name can be omitted from all medical records submitted.
In addition, after the initial hearing, the parties stipulated into evidence the affidavits of Christopher Meis and Paul Guzewicz.
***********
Based upon all of the competent, credible, and convincing evidence in the record, the undersigned make the following
 FINDINGS OF FACT
1. As of April 1992, plaintiff was almost thirty years old and was a registered nurse. She had completed her associate's degree and was working towards her bachelor's degree, which she completed later that year. She was also employed by defendant as a registered nurse at Forsyth Hospital, where she had worked since July, 1991. During this period of employment at Forsyth Hospital, she worked as a staff nurse in the pulmonary unit on the night shift.
2. On April 18, 1992, plaintiff reported for work as scheduled for the nine o'clock p.m. to seven o'clock a.m. shift. She was assigned to approximately ten patients in the pulmonary unit for that shift and she began to provide nursing care to those patients. Sometime between eleven-thirty p.m. and midnight, she was in the process of passing out medications to her assigned patients and was standing in the hallway next to her medication cart when there was a loud thump at one of the doors. The room involved belonged to one of her assigned patients, who was known to have acquired immunodeficiency syndrome (AIDS). Plaintiff and another nurse, Ellen Fox, went to the door and tried to open it, but there was resistance from inside of the room. They could not push it open. However, they were able to open it enough to look inside.
3. The patient in that room had been admitted to the hospital for a right pneumothorax and other AIDS-related pulmonary disease. By the date in question, he had had two chest tubes inserted. When the two nurses looked into his room, they found that he had gotten out of bed and walked to the door, pulling out both chest tubes and his IV. He had also been incontinent of bowel and bladder. He had fallen against the door and had sustained a gash to his forehead which was bleeding freely. Ms. Fox noted that his face appeared blue from lack of oxygen, so she squeezed through the opening to assist him.
4. Ms. Fox began to pull the patient away from the floor but slipped on the blood, stool, urine, and other bodily fluids on the floor. She fell to the floor in such a way that the patient's head ended up in her lap. By that time, plaintiff had entered the room. She immediately went to the patient to assess his condition. He was confused, bleeding from his head wound and IV site, and had bloody fluid draining from his chest tube wounds. Plaintiff checked his vital signs to make sure that she did not have a "code" situation. The nurses then decided that, in order to get him back into bed, the floor would have to be cleaned, so that they would not fall. Ms. Fox was not in a position to render assistance with that task.
5. The floor was covered in various bodily fluids from the bed to the door. Plaintiff went out to the medication cart in the hallway, put on gloves, and brought back towels which she used to soak up the fluids on the floor. Once a towel was saturated, she would throw it aside and get a clean one. She had to make several trips down the hall in order to get more towels and was repeatedly taking off and putting on gloves. It took thirty to forty-five minutes for her to get the floor cleaned and for the nurses to get the patient back into bed. During the time plaintiff was cleaning the floor, her supervisor came by and observed what was taking place.
6. At some point, plaintiff applied bandages to the patient's chest tube wounds. She also called his doctor, who subsequently came to the hospital to reinsert the check tube.
7. During the time she was attending to the patient on this occasion, plaintiff concentrated on the task at hand and did not pay much attention to her own circumstances. She initially was in contact with the patient without wearing gloves, while she initially checked his wounds and vital signs. Her hands were then immersed in blood and bodily fluids from the patient as she was cleaning the room. Although she wore latex gloves during most of that time, the gloves provided by the hospital were too large to fit her hands well and tended to slide down towards her fingers. At some time, and potentially more than once on this occasion, the patient's blood and bodily fluids came into direct contact with plaintiff's hands.
8. Plaintiff had a pre-existing skin condition which caused her hands to be excessively dry. Her skin condition was aggravated by the constant hand washing required of hospital nurses and was irritated by the powdered latex gloves she had to wear at the hospital. Consequently, the skin on her fingers and hands was normally very red and chapped, and had small fissures. Sometimes she had open cracks with bleeding. However, she did not remember having those at the time in question. Nevertheless, there were small fissures in the skin of her hands.
9. After the patient was cleaned up and cared for, plaintiff and Ms. Fox resumed their other duties. It did not occur to either of them that they had been exposed to any transmission of the human immunodeficiency virus (HIV). Consequently, plaintiff made no report of a potential exposure to her employer. Her supervisor, who had observed her cleaning the floor, also made no report of such a potential exposure.
10. Approximately one month later, plaintiff noticed a lump between her left armpit and her breast. She went to Dr. Folds, her primary physician, on May 29, 1992. He ordered a mammogram and referred her to Dr. Simstein, a surgeon. When Dr. Simstein examined her on June 19, 1992, he found large lymph nodes in both axillae and thought her liver and spleen were enlarged upon examination. Consequently, he ordered additional tests. During this time, plaintiff was feeling fatigued and advised Dr. Simstein that she had been feeling "run down". She also had some instances where she woke up at night wet with perspiration. She and her husband attributed the problem to an egg crate mattress pad that they had been using, so they discarded the mattress pad.
11. The tests ordered by Dr. Simstein were within normal limits, so he advised Dr. Folds that, if plaintiff continued to have problems, the lymph nodes should be biopsied. Apparently, Dr. Folds never followed up with plaintiff; and by July, plaintiff began to feel well again. Consequently, she did not return to the doctor for further treatment.
12. In July 1992 plaintiff left her employment with defendant to pursue her master's degree. She began working for a home health agency, where she could have more flexible hours to accommodate her school schedule. In approximately June of 1993, she began working for Baptist Hospital on an orthopedic floor. In neither of these positions was there any known exposure to the blood or bodily fluids of an AIDS patient. She continued working for Baptist Hospital until May of 1995, when she returned to work for defendant. As of that month, she had completed her master's degree and was qualified as a geriatric nurse practitioner. She was hired to work at Medical Associates of Davie County, where she worked with elderly patients in a nursing home. She remained so employed through the date of the initial hearing.
13. After the symptomatic episode in May and June 1992, plaintiff did not have any similar symptoms or unusual physical problems except for some lymph node enlargement. She felt normal and assumed that her health was fine. In 1994, she was required to take an HIV test in order to qualify for a life insurance policy for which both she and her husband had applied. Following the test, she was notified that she had tested positive. She then retook the test to see if the result had been a false positive, but the result was again positive.
14. Dr. Pennington, who was then plaintiff's primary physician, referred her to Dr. Peacock, an infectious disease specialist at the Wake Forest University School of Medicine. She first saw Dr. Peacock on November 1, 1994. At this time, she was still asymptomatic and would not have been aware of the illness if she had not been tested for it. When questioned by Dr. Peacock, she indicated that the most likely source of the disease was a man with whom she had been intimate prior to her relationship with her husband. However, that man had recently denied any knowledge of having an HIV infection. She described her potential exposure with defendant and then remembered a prior exposure while working at the UNC's Memorial Hospital in Chapel Hill.
15. In approximately June of 1990, plaintiff had to remove an IV from a patient at UNC who had died from AIDS so that his body could be transferred to the morgue. Her memory of the event has become cloudy, but she advised Dr. Peacock that the IV needle pricked her finger. She was wearing gloves at the time, but the glove was torn and there was blood on her finger. She did not remember if the injury "drew blood", although she thought that it had.
16. After obtaining test results showing that her immune status was reasonably good, Dr. Peacock advised plaintiff that no treatment would be prescribed at that time but that she should be monitored periodically to measure her immune status and viral load. In May 1995 plaintiff went to Dr. Eron, an infectious disease specialist at UNC who specialized in and did research on HIV and AIDS patients. She wanted another opinion regarding the advisability of treatment. He agreed with Dr. Peacock's recommendation. Consequently, plaintiff periodically returned to the doctors and had her CD4 and viral load levels checked. By October of 1996, her viral load level had increased to the point that Dr. Eron recommended that therapy be initiated.
17. Plaintiff returned to Dr. Peacock in January 1997 and advised him that she was ready to start the anti-retroviral therapy. Consequently, he prescribed triple drug therapy. The therapy required her to take three different medications at precise intervals and under specified conditions. Consequently, the treatment had a noticeable impact on her lifestyle. However, when Dr. Eron next saw her in May 1997, her CD4 test results had risen to acceptable levels and her viral load level had dropped to the point that it could no longer be detected. Except for some nausea associated with the medication, plaintiff remained asymptomatic, although Dr. Eron noted that she appeared to have some reactive depression. He prescribed antidepressant medication for her at that office visit in May of 1997.
18. Plaintiff continued to do well on the drug therapy through the date of the initial hearing and remained asymptomatic. In view of her positive response to the medication, her physicians expected for her to remain fully functional for approximately twenty years before she would be expected to develop significant illness-related symptoms and resulting disability.
19. Both Dr. Peacock and Dr. Eron advised plaintiff that the exposure she sustained in April 1992 while working for defendant-employer was the most likely cause of her disease. Although a percutaneous exposure to the blood of an infected person, such as with a needle stick, would statistically be more likely to transmit the disease than a cutaneous exposure (where the infected blood was merely in contact with skin) since plaintiff had visibly chapped skin with small fissures in the skin of her hands and fingers, and since she developed classic symptoms of an acute HIV syndrome within the expected period of time after her April 1992 exposure, the exposure in April 1992 appeared to be the more likely source of her infection. She had no other known exposures than those she related to the doctors.
20. Plaintiff has developed an HIV infection. As a staff nurse on a hospital floor where patients with advanced AIDS were treated, she was placed at an increased risk of contracting an HIV infection over members of the general public not so employed. In that none of the men with whom she had been sexually intimate tested HIV positive, in that her only other known exposure to the virus occurred in 1990 with no "acute HIV syndrome" occurring afterwards, and in that she developed symptoms of an acute HIV syndrome within six weeks following her exposure to the virus while working for defendant, her exposure on April 18 and 19, 1992 was the likely cause of her disease and therefore significantly contributed its development.
21. Plaintiff's HIV infection was an occupational disease which was due to causes and conditions characteristic of and peculiar to her employment with defendant-employer and which was not an ordinary disease of life to which the general public was equally exposed.
22. As of the date of the initial hearing, plaintiff had not lost any time from work due to her illness. However, she has required medical observation and treatment and is expected to require medical treatment for the remainder of her life. For the foreseeable future, the triple drug therapy prescribed by Dr. Peacock will be used to suppress the disease. Such treatment will tend to give her relief and lessen her disability.
23. Defendant has defended this claim on the basis that plaintiff did not give immediate notice to her exposure to the hospital. With immediate notice provided, the hospital would have provided the medication AZT prophylactically in an attempt to prevent the virus from transmitting to her cells. However, plaintiff was not aware of the exposure at the time. She was concentrating on the needs of her patient in a semi-emergency. Under the circumstances, the exposure was not definite or clear. In fact, even her supervisor, who observed her cleaning the floor that night, did not take action to report a potential exposure. In any event, it was at least two and one-half years later before she was advised by a physician that her condition could be work related. Causation has been an issue throughout the pendency of this claim, but in July and August of 1997, both doctors gave written opinions to plaintiff's counsel relating her disease to the exposure in April 1992. These letters were sent two years after defendant had written notice of the claim.
***********
Based upon the foregoing stipulations and findings of fact, the undersigned make the following
 CONCLUSIONS OF LAW
1. As of April 19, 1992 plaintiff developed an HIV infection, an occupational disease which was due to causes and conditions characteristic of and peculiar to her employment and which was not an ordinary disease of life to which the general public was equally exposed. N.C. Gen. Stat. § 97-53(13). Bookerv. Duke Medical Center, 297 N.C. 458 (1979).
2. Plaintiff was not required by law to give immediate notice to her employer of a potential exposure to an HIV infection. Rather, notice of an occupational disease was not required until she had been informed by competent medical authority of the work related nature of her condition. Since she gave proper notice of her claim within the time allowed by statute, her claim is not barred. N.C. Gen. Stat. § 97-58.
3. Plaintiff is entitled to have defendants provide all medical compensation arising from this occupational disease, including future medical treatment. N.C. Gen. Stat. § 97-2(19); N.C. Gen. Stat. § 97-59.
4. In that plaintiff had sustained no disability as of the date of hearing due to her occupational disease, she is not yet entitled to receive any indemnity compensation. N.C. Gen. Stat. § 97-29 and 30.
***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following
 AWARD
1. Defendant shall pay all medical expenses incurred by plaintiff as a result of her occupational disease, including those arising from necessary future medical treatment.
2. Since no compensation is being awarded at this time from which to deduct an attorney's fee, an attorney's fee is not approved in this award. However, counsel may submit a written petition for approval of a fee for subsequent ruling.
3. Defendants shall pay the costs.
IT IS FURTHERMORE ORDERED that this case be REMOVED from the Full Commission hearing docket.
This the ___ day of ___________, 1999.
 S/_____________ J. HOWARD BUNN, JR. CHAIRMAN
CONCURRING:
S _____________ THOMAS J. BOLCH COMMISSIONER
S/_____________ BERNADINE S. BALLANCE COMMISSIONER
JHB:kws